**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

**IVETTE MARTINEZ-GONZALEZ**, *et al.*,

      Plaintiffs

      v.

**CATHOLIC SCHOOLS OF THE
ARCHDIOCESES OF SAN JUAN
PENSION PLAN**, *et al.*,

      Defendants.

Civil No. 16-2077 (GAG/BJM)

<u>**REPORT AND RECOMMENDATION**</u>

This case presents an important threshold issue that has been the subject of much recent litigation and that is presently before the U.S. Supreme Court:[1] whether the church-plan exemption under the Employee Retirement Income Security Act of 1974 ("ERISA" or "Act"), 29 U.S.C. § 1001 *et seq.*, applies so long as a pension plan is maintained by an otherwise qualifying church-affiliated organization, or whether the exemption applies only if, in addition, a church initially established the plan. Ivette Martinez-Gonzalez and other alleged beneficiaries (collectively, "Martinez") of the Catholic Schools of the Archdioceses of San Juan Pension Plan (the "Plan") brought this ERISA action against the Plan, the Plan's administrators, and the Plan's sponsor—the Superintendence of Catholic Schools of the Archdioceses of San Juan (the "Superintendence").[2] The Superintendence, joined by the Plan's Trust and the Plan's administrators, moved to dismiss the amended complaint for failure to state a claim and lack of subject-matter jurisdiction, Docket Nos. 27, 37, 48-1, 75, and Martinez opposed. Docket Nos. 41, 45, 61-1, 73. This matter was referred to me for a report and recommendation. Docket Nos. 54, 74.

For the reasons set forth below, the motion to dismiss should be **DENIED**.

---

[1] *See Dignity Health v. Rollins*, No. 16-258, 2016 WL 4540399, at *1 (U.S. Dec. 2, 2016).

[2] The amended complaint also names as defendants three unidentified insurance companies, two unidentified surety or bond companies, and three unidentified individuals or investment companies acting as fiduciaries for the Plan. Docket No. 9 ("Am. Compl.").

## MOTION TO DISMISS STANDARD

Federal Rule of Civil Procedure 12(b)(1) governs motions to dismiss for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The "party invoking the jurisdiction of a federal court carries the burden of proving its existence." *P.R. Tel. Co. v. Telecomm's Reg. Bd. of P.R.*, 189 F.3d 1, 7 (1st Cir. 1999). When deciding whether subject-matter jurisdiction exists, the court follows two general rubrics: (1) when a defendant challenges the legal sufficiency of the facts alleged, the court credits the plaintiffs' factual allegations and draws reasonable inferences in his or her favor; and (2) when the defendant challenges the truth of facts alleged by the plaintiff and offers contrary evidence, the court weighs the evidence. *Valentín v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), on the other hand, "an adequate complaint must provide fair notice to the defendants and state a facially plausible legal claim." *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011). To do so, the complaint must set forth "factual allegations, either direct or inferential, regarding each material element necessary" for the action. *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir. 1988). When evaluating the complaint, the court first discards any "'legal conclusions couched as fact' or 'threadbare recitals of the elements of a cause of action.'" *Ocasio-Hernández*, 640 F.3d at 12 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The remaining "[n]on-conclusory factual allegations" are fully credited, "even if seemingly incredible." *Ocasio-Hernández*, 640 F.3d at 12. The court engages in no fact-finding when considering the motion, and does not "forecast a plaintiff's likelihood of success on the merits." *Id.* at 13. Rather, the court presumes that the facts are as properly alleged by the plaintiff, and draws all reasonable inferences in the plaintiff's favor. *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012). Taken together, the facts pleaded must "state a plausible, not a merely conceivable, case for relief." *Ocasio-Hernández*, 640 F.3d at 12.

## BACKGROUND[3]

Around 40 years ago, the Superintendence "established" a multiple-employer, defined-benefit pension plan (the "Plan") for employees of Catholic schools in Puerto Rico that elected to participate in the Plan. Am. Compl. ¶¶ 5, 19. These schools are allegedly controlled by an independent board of directors rather than the Roman Catholic Church of Puerto Rico. *Id.* A trust was established for the Plan, and several fiduciaries were designated to administer the Plan. *Id.* ¶¶ 5, 7–14. Martinez and all other plaintiffs named in the complaint reside in Puerto Rico and are vested participants or beneficiaries of the Plan. *Id.* ¶¶ 4, 59.

### The Plan

The Plan was established in 1979, and the Superintendence was identified as the Plan's "settlor or sponsor." *Id.* ¶¶ 6, 19. Several fiduciaries, along with the Superintendence, were designated at that time to establish a trust that would administer the Plan. *Id.* ¶ 19. The Deed of Trust, which was approved by the Plan, required the trustees to pay a bond pursuant to a statutory provision of ERISA. *Id.* ¶¶ 21, 22. Article 2 of the Plan provides that it shall be "interpreted and administered in a consistent manner with the provisions" of ERISA and the income tax law of Puerto Rico, "or any future provision of any applicable law." *Id.* ¶ 22. Similarly, Article 21 of the Plan provides that the Plan "and all its provisions shall be interpreted pursuant to" Puerto Rico law and ERISA. *Id.* After the Plan was approved, the Plan's beneficiaries received a notice informing them of various rights protected by ERISA. *Id.* ¶ 24. And a similar notice was disseminated by the Superintendence in September 1993. *Id.* ¶ 25.

### Alleged ERISA Violations

The Plan's administrators allegedly failed to comply with ERISA because they failed to: (1) send a summary of the annual financial report of the Plan to the participants

---

[3] This narrative is based on the well-pleaded allegations in the amended complaint—which must be assumed as true when evaluating a Rule 12(b)(6) motion to dismiss. Docket No. 9.

and beneficiaries; (2) send the beneficiaries actuarial studies or audited financial statements that related to the Plan; (3) pay annual premiums imposed by the Pension Benefit Guaranty Corporation ("PBGC") since 2009; (4) pay a bond; (5) take measures since 2009 to prevent the Plan's insolvency; (6) diversify the investment fund portfolio by investing 80% of the Plan's funds in "risk[y]" closed-end-bond funds and bonds issued by public agencies in Puerto Rico; (7) act with due "care, skill, and diligence" under the circumstances; (8) maintain an "independent and critical eye" when investing the Plan's funds with the help of outside consultants; and (9) correct their imprudent investments. *Id.* ¶¶ 26–37. And the brokers who advised the Plan's administrators, the complaint states, are also allegedly liable for the imprudent investment advice they provided. *Id.* ¶¶ 38–42.

### *Termination of the Plan & Church-Plan Exemption*

In March 2016, the Superintendence, together with the Plan's administrators and fiduciaries, terminated the Plan and relayed to the Plan's participants and beneficiaries that the Plan was not covered by ERISA because it was a "church plan." *Id.* ¶ 43. Taking issue with this characterization of the Plan, Martinez alleges that the Plan is covered by ERISA and that the church-plan exemption "is not applicable to the" Plan. *Id.* ¶¶ 46–47. The amended complaint marshals two alternative bases for alleging that the Plan is not within the ambit of ERISA's church-plan exemption. *Id.* ¶¶ 47, 49, 50.

First, Martinez alleged that "most, if not all of the participating employers failed to request exemption from taxation" under the Internal Revenue Code. *Id.* ¶ 49 (citing 29 U.S.C. § 1002(33)(C)(ii)). Second, and "[a]lternatively," Martinez alleged that Congress did not intend "to permit church agencies to sponsor their own pension plan—it merely intended to allow employees of church agencies or parochial schools to participate in plans established and maintained by churches or [a] convention or association of churches." Am. Compl. ¶ 50. The amended complaint further alleged that the church-plan exemption violates the Establishment Clause of the First Amendment. *Id.* ¶ 51.

Given that the Plan has been voluntarily terminated, Martinez alleges that the beneficiaries are entitled to have the assets of the Plan distributed in accordance with the provisions of ERISA. *Id.* ¶ 54. At the time the amended complaint was filed, however, the Plan's beneficiaries had not been informed with sufficient specificity how the Plan's assets would be distributed, or the amount of non-forfeitable benefits to which they are entitled. *Id.* ¶¶ 55–58. Martinez and the other beneficiaries claim that they have never waived any of the notices they were entitled to receive. *Id.* ¶ 56. In June 2016, Martinez and the other beneficiaries filed this action to obtain injunctive relief, payment of benefits, removal of the Plan's administrators, attorneys' fees, and costs—alleging termination of the Plan in violation of ERISA-required procedures, breach of fiduciary duties, breach of the duty of disclosure, and breach of co-fiduciary duties. *Id.* ¶¶ 56, 61–83.

## DISCUSSION

The Superintendence challenges the court's subject-matter jurisdiction, and contends that the amended complaint fails to state a claim under ERISA because the Plan qualifies as an exempt "church plan." Martinez responds that ERISA's church-plan exemption is inapplicable, and that the Superintendence muddles jurisdictional with merits-based issues when challenging the court's authority to hear this case.

## I.       Jurisdictional Challenge

At the outset, the Superintendence contends that the court lacks subject-matter jurisdiction because the Plan is an ERISA-exempt "church plan." Docket No. 27 at 5. "Generations of jurists have struggled with the difficulty of distinguishing between Rules 12(b)(1) and 12(b)(6) in federal question cases . . . ." *Primax Recoveries, Inc. v. Gunter*, 433 F.3d 515, 517 (6th Cir. 2006) (quoting *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1188 (2d Cir. 1996)). "In theory, the difference is clear: 'the former determines whether the plaintiff has a right to be in the particular court and the latter is an adjudication as to whether a cognizable legal claim has been stated.'" *Gunter*, 433 F.3d at 517 (quoting 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure

§ 1350 (3d ed. 2004)). Here, the problem with the Superintendence's argument is that it "confound[s] jurisdictional with merits-based issues." *See Cruz-Vazquez v. Mennonite Gen. Hosp., Inc.*, 717 F.3d 63, 67 (1st Cir. 2013) (improper to use "a jurisdictional framework to assess the merits" of a claim arising under federal law).

The Supreme Court "has established that a district court properly exercises jurisdiction under Section 1331 when a plaintiff's complaint is based on a right conferred under federal law." *Templeton Bd. of Sewer Comm'rs. v. Am. Tissue Mills of Mass., Inc.*, 352 F.3d 33, 36–37 (1st Cir. 2003) (citing *Oneida Indian Nation v. Cnty. of Oneida*, 414 U.S. 661, 666 (1974)); *see also* 28 U.S.C. § 1331. "Whether a claim arises under federal law is determined under the well-pleaded complaint rule," *Templeton*, 352 F.3d at 37, which requires the jurisdictional question to be determined "from what necessarily appears in the plaintiff's statement of his own claim in the bill or declaration." *Id.* (quoting *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 10 (1983)).

The Supreme Court has also "admonished courts to use the term 'jurisdiction' with more precision, describing the term as 'a word of many, too many, meanings.'" *Gunter*, 433 F.3d at 518 (quoting *Kontrick v. Ryan*, 540 U.S. 443, 453 (2004)). And "where, as here, both the court's subject-matter jurisdiction and the substantive claim for relief are based on the same federal statute," *Gunter*, 433 F.3d at 519, the Supreme Court has held that "[d]ismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (quoting *Oneida Indian Nation*, 414 U.S. at 666); *see also Gunter*, 433 F.3d at 517 ("a federal court has subject-matter jurisdiction, even if the plaintiff is unable to state a claim upon which relief can be granted").

*Stapleton v. Advocate Health Care Network*, 817 F.3d 517 (7th Cir. 2016), aptly illustrates why the Superintendence's argument "confounds jurisdictional with merits-

based issues." *See Cruz-Vazquez*, 717 F.3d at 67. In *Stapleton*, Advocate Health Care
Network moved to dismiss the complaint under both Rules 12(b)(1) and 12(b)(6),
contending that the pension plan at issue was an ERISA-exempt church plan. 817 F.3d at
521. The district court and the Seventh Circuit held that the use of a Rule 12(b)(1) motion
was improper. *See id.* at 521 n.4. The Seventh Circuit held that, while Advocate Health
Care Network "premised its motion to dismiss on both a failure to state a claim under Rule
12(b)(6) and a lack of subject matter jurisdiction under 12(b)(1), the district court
[correctly] made short order of the claim under 12(b)(1) noting that '[t]o ask whether a
federal law like ERISA reaches a certain actor or conduct in the first place is itself a merits
question, not a jurisdictional one.'" *See id.* (quoting *Stapleton v. Advocate Health Care
Network*, 76 F. Supp. 3d 796, 798 (N.D. Ill. 2014)).

What is more, the court should not find that Martinez's alleged ERISA claim is "'so
insubstantial, implausible, foreclosed by prior decisions of th[e Supreme] Court, or
otherwise completely devoid of merit as not to involve a federal controversy.'" *See Steel
Co.*, 523 U.S. at 89. Indeed, a primary threshold issue in this case "is springing up across
the country," *Stapleton*, 817 F.3d at 519, and is presently before the U.S. Supreme Court.
*See Dignity Health*, 2016 WL 4540399, at *1 (Ninth Circuit case consolidated with cases
from the Third and Seventh Circuits); *Advocate Health Care Network v. Stapleton*, No. 16-
74, 2016 WL 3856099, at *1 (U.S. Dec. 2, 2016); *Saint Peter's Healthcare Sys. v. Kaplan*,
No. 16-86, 2016 WL 3906477, at *1 (U.S. Dec. 2, 2016). Thus, the merits-based issues that
arise from the well-pleaded allegations in the amended complaint should be evaluated
under the rubric of the Rule 12(b)(6) motion-to-dismiss standard.

## II.    Church-Plan Exemption

ERISA was enacted "to protect 'the interests of participants in employee benefit
plans and their beneficiaries by setting out substantive regulatory requirements for
employee benefit plans and to provide for appropriate remedies, sanctions, and ready
access to the Federal courts.'" *Rollins v. Dignity Health*, 830 F.3d 900, 904–05 (9th Cir.

2016) (quoting *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (citations and internal quotation marks omitted)).  Once employers have guaranteed their employees certain benefits, the Act "protects employees from unexpected losses in their retirement plans by setting forth specific safeguards for those employee plans." *Stapleton*, 817 F.3d at 519. "Church plans are exempt from ERISA's regulatory requirements unless the church waives the exemption." *Rollins*, 830 F.3d at 905 (citing 29 U.S.C. §§ 1003(b)(2), 1321(b)(3); 26 U.S.C. § 410(d)).  Pension plans that qualify for ERISA's church-plan exemption "need not comply with a host of ERISA provisions, including fiduciary obligations and minimum-funding rules."[4] *Kaplan v. Saint Peter's Healthcare Sys.*, 810 F.3d 175, 177 (3d Cir. 2015).

ERISA defines a "church plan"[5] as follows:

(33)(A) The term "church plan" means a plan established and maintained (to the extent required in clause (ii) of subparagraph (B)) for its employees (or their beneficiaries) by a church or by a convention or association of churches which is exempt from tax under section 501 of Title 26.

. . .

(C) For purposes of this paragraph—

(i) A plan established and maintained for its employees (or their beneficiaries) by a church or by a convention or association of churches *includes* a plan maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches.

29 U.S.C. § 1002(33) (emphasis added). The "essential structure" of the foregoing statutory provisions may be described as follows: "Paragraph 1003(b)(2) provides that a church plan

---

[4] ERISA is a "remedial" statute, and, consistent with that remedial purpose, should be "liberally construed in favor of protecting the participants in employee benefit plans." *See, e.g.*, *IUE AFL–CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 127 (3d Cir. 1986).

[5] "Congress used the term 'church plan' in enacting ERISA, but the exemption, of course, also applies to mosques, synagogues, temples, meeting houses, and all other houses of worship." *Stapleton*, 817 F.3d at 519.

is exempt from ERISA. Paragraph 1002(33)(A) provides that in order to qualify for the church-plan exemption, a plan must be both established and maintained by a church. Subparagraph (C)(i) provides that a plan established and maintained by a church 'includes' a plan maintained by a principal-purpose organization." *Rollins*, 830 F.3d at 905.

In this case, the Superintendence contends that the Plan is an ERISA-exempt church plan, and so Martinez's ERISA claims should be dismissed. But, on the other hand, Martinez contends that the Plan is not exempt because, while the Plan is *maintained* by a church-affiliated organization (i.e., the Superintendence), the Plan was not *established* by a church (i.e., the Catholic Church).[6] In this vein, while the Superintendence initially claimed that it "is uncontested" that the Plan was "established by the church," Docket No. 27 at 4, the Superintendence later backpedaled on this argument—acknowledging that the Plan was established by the *Superintendence* and claiming that the "Superintendence" is an "office" of the Archdioceses of San Juan and a "branch" of the Catholic Church. *See id.*; *see also* Docket No. 48-1 at 5. In light of this relationship, defendants add that the Superintendence and the schools it oversees are an "integral part" of the Catholic Church and its religious mission. Docket Nos. 27 at 18, 48-1 at 19 n.29. But notably, the Superintendence does not go as far as to press the theory that the Plan was established by the Catholic Church *itself*. *See infra* Pt. II.E.

To resolve the parties' dispute concerning the scope of the ERISA church-plan exemption, it is necessary to turn to the "traditional tools of statutory construction." *See*

---

[6] The Superintendence claims there "is not a single sentence" in the amended complaint referring to this theory. Docket No. 48-1 at 4. But Martinez alleged two *alternative* bases for claiming that the Plan is not an ERISA-exempt church plan. *See* Am. Compl. ¶¶ 47, 49, 50. Paragraph 49 of the amended complaint detailed one theory, and Paragraph 50 detailed another: that Congress did not intend to allow "church agencies to *sponsor* their own pension plans." *Id.* ¶ 50 (emphasis added). Because the amended complaint pellucidly identified the Plan's "sponsor" as the Superintendence, one can readily infer that Martinez alleged that Congress did not intend to allow church agencies, such as the Superintendence, to sponsor (i.e., establish) their own pension plans. *Id.* ¶ 6. Thus, the Superintendence's argument lacks merit and should be rejected. And because the theory articulated in Paragraph 50 allows the amended complaint to survive the motion to dismiss, it is unnecessary to address the other theory, which has also been briefed by the parties.

*L.S. Starrett Co. v. FERC*, 650 F.3d 19, 25 (1st Cir. 2011) ("In determining congressional intent, we employ the traditional tools of statutory construction, including a consideration of the language, structure, purpose, and history of the statute.") (quoting *In re Hill*, 562 F.3d 29, 34 (1st Cir. 2009)); *see also Rollins*, 830 F.3d at 905–912 (court considered statutory text, legislative history, related statutes, agency interpretations, and the constitutional avoidance doctrine); *Stapleton*, 817 F.3d at 521–32 (same); *Kaplan*, 810 F.3d at 180–87 (court considered plain meaning of statute, canons of construction, legislative history, agency rulings, argument relating to congressional ratification, and constitutional avoidance doctrine).

### A.      Plain Meaning

When a court is tasked with interpreting a statute, the "starting point . . . 'is the language of the statute itself'"—as absent "'a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.'" *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835 (1990) (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980)). The plain language of subsection (33)(A), 29 U.S.C. § 1002(33)(A), imposes "two separate elements" for the church-plan exemption to apply: "(1) a church must first create or establish the plan and then (2) maintain the plan." *Stapleton*, 817 F.3d at 522.

The plain language of subsection (33)(C)(i), 29 U.S.C. § 1002(33)(C)(i), serves to "broaden" the church-plan exemption—but not to the extent suggested by the Superintendence. *See Rollins*, 830 F.3d at 906. There "are two possible readings of subparagraph (C)(i)": (1) "the subparagraph can be read to mean that a plan need only be maintained by a principal-purpose organization to qualify for the church-plan exemption," or (2) "the subparagraph can be read to mean merely that maintenance by a principal-purpose organization is the equivalent, for purposes of the exemption, of maintenance by a church." *See Rollins*, 830 F.3d at 905–06. Each reading has important implications on the scope of the church-plan exemption: under the first construction, "a plan maintained by a

principal-purpose organization qualifies for the church-plan exemption even if it was
established by an organization other than a church"; on the other hand, under the second
construction, "the exemption continues to require that the plan be established by a church."
*See id.*

The Third, Seventh, and Ninth Circuits—which to date have been the only circuit
courts to consider the precise issue before the court—have held that "the more natural
reading of subparagraph (C)(i) is that the phrase preceded by the word 'includes' serves
only to broaden the definition of organizations that may maintain a church plan." *See
Rollins*, 830 F.3d at 906; *Stapleton*, 817 F.3d at 522–23; *Kaplan*, 810 F.3d at 180–183. In
light of this construction, these three circuit courts have held that the "phrase does not
eliminate the requirement that a church plan must be established by a church." *Rollins*, 830
F.3d at 906 (citing *Stapleton*, 817 F.3d at 523–27; *Kaplan*, 810 F.3d at 180–81).

To explain the result above, the Seventh and Ninth Circuits have relied upon the
following illustration crafted by the Third Circuit: "[A]ny person who is disabled and a
veteran is entitled to free insurance. . . . [A] person who is disabled and a veteran includes
a person who served in the National Guard." *Kaplan*, 810 F.3d at 181. "It is reasonably
clear from context that a person who served in the National Guard satisfies the requirement
that he or she be a veteran, but that this person qualifies for free insurance only if he or she
is also disabled." *Rollins*, 830 F.3d at 906. Likewise, "in subparagraph (C)(i), it is
reasonably clear from context that a plan maintained by a principal-purpose organization
satisfies the requirement that it be maintained by a church, but that the plan qualifies as a
church plan only if it was also established by a church." *Id.*

Put another way, after deconstructing the plain language of ERISA's church-plan
exemption, the statutory text reveals three propositions about the contours of the
exemption: (1) a "church plan established by a church and maintained by a church is a
church plan"; (2) "a church plan established by a church and maintained by a church-
affiliated organization is [also] a church plan"; and (3) a "church plan established by a

church-affiliated organization and maintained by a church-affiliated organization is *not* a church plan." *See Stapleton*, 817 F.3d at 523 (emphasis added).

And while courts previously evaluated church plans by "looking primarily at whether factually, the institutions were sufficiently affiliated with a church," the Seventh Circuit noted that "in doing so" the courts "merely glossed over the statutory language and assumed that the exemption applied to plans established by church-affiliated agencies." *Stapleton*, 817 F.3d at 525 (citing cases like *Thorkelson v. Publ'g House of the Evangelical Lutheran Church in Am.*, 764 F. Supp. 2d 1119, 1128–29 (D. Minn. 2011), which are cited by the Superintendence for support). For example, "the Fourth Circuit—the only other circuit to even tangentially address the question—proceeded" by concluding that "'a plan established by a corporation associated with a church can still qualify as a church plan.'" *See id.* (quoting *Lown v. Cont'l Cas. Co.*, 238 F.3d 543, 547 (4th Cir. 2001)).

The Fourth Circuit's approach inadequately considered the statutory text, the Seventh Circuit explained, because the *Lown* court arrived at its decision "solely on the language of subsection (33)(C)(i) without any explanation for the discrepancy with subsection (33)(C)(A) requiring that the plan be established by a church." *Stapleton*, 817 F.3d at 525 (citing *Lown*, 238 F.3d at 547). Relying on *Lown*'s erroneous approach, *Torres v. Bella Vista Hospital, Inc.*, 639 F. Supp. 2d 188, 193 (D.P.R. 2009), which the Superintendence cites for support, held that the "term 'church plan' is quite broad because even a plan established by a corporation controlled by or associated with a church can also qualify as a church plan." *See id.* (citing *Lown*, 238 F.3d at 547).

Notwithstanding the above, some district courts have held that the church-plan exemption applies where a church-affiliated organization maintains a pension plan even if a church did not establish the plan. In so holding, at least two district courts have read the "established and maintained" language in subsection (C)(i) "as a 'singular requirement, a term of art,' rather than two distinct elements." *See Stapleton*, 76 F. Supp. 3d at 802 (citing *Medina v. Catholic Health Initiatives*, No. 13 CV 01249, 2014 WL 4244012, at \*2–3 (D.

Colo. Aug. 26, 2014) (overruling Report and Recommendation of Magistrate Judge) and *Overall v. Ascension*, 23 F. Supp. 3d 816, 829 (E.D. Mich. 2014)).

Disagreeing with the approach taken by *Medina* and *Overall*, the lower court in *Stapleton* astutely observed that neither of these two cases "explain why 'established and maintained' should be read as a singular term of art when" when "as a matter of grammar and practice, those two words have separate, ordinary meanings." *See Stapleton*, 76 F. Supp. 3d at 802. And, as noted above, the circuit courts that considered the issue before the court have not followed the approach taken by *Medina* or *Overall*, reasoning that well-established principles of statutory construction require courts to give effect to each and every word in a statute. *See, e.g.*, *Stapleton*, 817 F.3d at 526; *see also United States v. Menasche*, 348 U.S. 528, 538–39 (1955) ("It is our duty 'to give effect, if possible, to every clause and word of a statute'") (quoting *Inhabitants of Montclair Tp. v. Ramsdell*, 107 U.S. 147, 152 (1883)). In light of the plain meaning of the statutory text establishing ERISA's church-plan exemption, this court should find that the better-reasoned view holds that a church plan established by a church-affiliated organization—such as the Superintendence––and maintained by such an organization is not a church plan. Thus, the court should deny the Superintendence's motion to dismiss.

**B.    Legislative History**

The terms of the statutory text establishing the church-plan exemption are clear, and so resort to the statute's legislative history is unnecessary. *See Mohamad v. Palestinian Auth.*,— U.S. —, 132 S. Ct. 1702, 1709 (2012); *Rollins*, 830 F.3d at 906; *Stapleton*, 817 F.3d at 527; *Kaplan*, 810 F.3d at 183. Importantly, Martinez argued that the legislative history confirms her position, while the Superintendence elected not to discuss that legislative history. Docket No. 48-1 at 16 & 16 n.20. The legislative history indeed confirms the conclusion one reaches after evaluating the plain meaning of the statutory text establishing ERISA's church-plan exemption.

Martinez-Gonzalez, *et al.* v. Catholic Schools of the Archdioceses of San Juan Pension Plan, *et al.*, Civil No. 16-2077
(GAG/BJM)                                                                                                                                                    14

Having reviewed the legislative history surrounding the current statutory text of the

church-plan exemption, the *Rollins* court did not find "anything in the legislative history

of subparagraph (C)(i) to suggest that Congress intended, in broadening the definition of

organizations that are authorized to maintain a church plan, to eliminate" the requirement

that a church plan be established by a church. 830 F.3d at 908. Nor was there anything in

"the legislative history of subparagraph (C)(ii) to suggest that Congress intended, in

expanding the definition of eligible employees, to eliminate the requirement that a church

plan be established by a church." *See id.* The *Stapleton* and *Kaplan* courts also reviewed

the legislative history and arrived at similar conclusions. *See Stapleton*, 817 F.3d at 530;

*Kaplan*, 810 F.3d at 185. Thus, the legislative history supports Martinez's view of the scope

of the church-plan exemption.

### C.       Constitutional Avoidance & First Amendment

Martinez and the Superintendence each argue that construing the church-plan

exemption against their respective positions violates the First Amendment to the U.S.

Constitution. Martinez alleged in the amended complaint that construing ERISA's church-

plan exemption to exempt the Plan violates the Establishment Clause of the First

Amendment. Am. Compl. ¶ 51. The constitutional avoidance doctrine counsels that

Martinez's argument need not be addressed, as the construction of the church-plan

exemption I recommend "provides the plaintiffs with all of the relief they request." *See*

*Stapleton*, 817 F.3d at 531 (plaintiffs' First Amendment argument not addressed where

court held that church-plan exemption did not apply to the pension plan in question); *see*

*also Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485

U.S. 568, 575 (1988) ("Where an otherwise acceptable construction of a statute would raise

serious constitutional problems, the Court will construe the statute to avoid such problems

unless such construction is plainly contrary to the intent of Congress.").

The Superintendence, relying on *Medina* and *Overall*, contends that the

construction of the church-plan exemption urged by Martinez violates the First Amendment

because it invites the court to "alter the church's polity, administration, and community." Docket No. 48-1 at 16–17. Not so. As the Seventh Circuit explained, the "problem" with this constitutional argument is that in "order for a church-affiliated organization to take advantage of the exemption, the government must still determine whether the entity with which that organization is claiming affiliation is indeed a church." *Stapleton*, 817 F.3d at 531. "And in determining whether that allegedly affiliated organization is indeed sufficiently associated with the church, the courts invariably dig deeply through the workings of the church and its relationships with the affiliated agency." *Id.*

The *Rollins* court added several other reasons for concluding that the First Amendment is not violated by the construction adopted by the circuit courts. *See Rollins*, 830 F.3d at 910–12. Among other things, *Rollins* explained that "[n]umerous federal statutes have long drawn the distinction between churches and other religious organizations . . . . [and] these statutes are constitutional because they distinguish between churches and other religious organizations based on neutral, objective organizational criteria." *See id.* at 911 (internal citations and quotations omitted). The Ninth Circuit also added that there is "no Free Exercise violation, for even assuming that a church's choice of organizational form is an 'internal church decision that affects the faith and mission of the church,' the church-plan exemption does not interfere with this choice." *Id.* at 912 (quoting *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. —, 132 S. Ct. 694, 706–07 (2012)). Thus, the Superintendence's First Amendment argument lacks merit and should be rejected.

### D.    IRS Rulings

The Superintendence underscores that the IRS has confirmed that the United States Conference of Catholic Bishops has a group tax exemption and that "subordinate organizations" within that group exemption include the Catholic schools and entities of the of the Archdioceses of San Juan, as well as the Dioceses of Arecibo, Caguas, and Fajardo. Docket Nos. 27 at 20–21, 48-1 at 15. To the extent the Superintendence relies on the IRS's

private letter ruling to contest the result of the statutory analysis above, that reliance is misplaced. The "Internal Revenue Code gets its definition of church plans from ERISA." *Kaplan*, 810 F.3d at 185. "After Congress passed the ERISA amendments, the IRS began distributing letter rulings in which it issued ERISA exemptions to plans established by church-affiliated organizations." *Stapleton*, 817 F.3d at 530.

But the position of the IRS has been rejected by the Third, Seventh, and Ninth Circuits. First, the position of the agency was established in an IRS General Counsel Memorandum and private letter rulings rather than after a "formal adjudication or notice and comment rulemaking." *See Stapleton*, 817 F.3d at 530 (quoting *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000)). For this reason, the agency's interpretation is not entitled to deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984). Rather, the agency's interpretation is entitled to "respect" under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)—"'but only to the extent that those interpretations have the 'power to persuade.'" *Christensen*, 529 U.S. at 587 (quoting *Skidmore*, 323 U.S. at 140). Because the IRS's position "is based on a clear misreading of the text" establishing ERISA's church-plan exemption, the Ninth Circuit has "agree[d] with the Third and Seventh Circuits that the [position of the IRS, which was established in the IRS General Counsel Memorandum,] is not entitled to deference." *Rollins*, 830 F.3d at 910; *see also Kaplan*, 810 F.3d at 185 ("The IRS' 1983 memorandum lacks the power to persuade because it does not even consider the church establishment requirement of § 3(33)(A).").

Second, the Ninth and Seventh Circuits have held that Congress did not acquiesce to the IRS's interpretation of the church-plan exemption. *See Rollins*, 830 F.3d at 910; *Stapleton*, 817 F.3d at 530–31. "Congressional acquiescence to an agency's statutory construction may be inferred only where there is 'overwhelming evidence that Congress considered and failed to act upon the precise issue before the court.'" *Stapleton*, 817 F.3d at 530 (quoting *Rapanos v. United States*, 547 U.S. 715, 750 (2006) (internal citation

omitted)). "Congressional silence lacks persuasive significance . . . particularly where administrative regulations are inconsistent with the controlling statute." *Brown v. Gardner*, 513 U.S. 115, 121 (1994) (internal citations omitted). Having reviewed the legislative history, the Seventh and Ninth Circuits have concluded that there "is no evidence that Congress was aware of the agency's interpretation and acquiesced." *Stapleton*, 817 F.3d at 531; *Rollins*, 830 F.3d at 910. Thus, while the IRS has interpreted the scope of the church-plan exemption in a manner favorable to the Superintendence, that position is not entitled to deference and should be rejected because it strays from the text of the statute and because there is no evidence that Congress acquiesced to the IRS's interpretation.

### E.     Church v. Church-Affiliated Organization

The Superintendence has taken at least two positions with respect to the entity that established the Plan and that entity's relationship to the Catholic Church. At the outset, for example, the Superintendence suggested that it is "uncontested" that the Plan "was established by the church"—rather than some organization or entity under the auspices of the Catholic Church. *See* Docket No. 27 at 4. But shortly after making this claim, and in later motions, the Superintendence acknowledges that the Plan was established by the *Superintendence*, and underscores that the Superintendence is an "office" of the Archdiocese of San Juan. *Id.*; Docket No. 48-1 at 2, 9–11. But notably, the Superintendence does not goes as far as to expressly state that the Catholic Church *itself* sponsored the Plan.

Rather, at one point in its briefing, the Superintendence suggests that the Archdioceses of San Juan is included in the Official Catholic Directory of 2016, which identifies the "subordinate organizations" operated by the Catholic Church. Docket No. 27 at 21. And the court should also take judicial notice that the Archdiocese of San Juan has filled a document in a Puerto Rico state court claiming that the "Archdiocese is a separate

and independent entity from the Catholic Church."[7] *See* Docket No. 66-4 at 1 ¶ 3; *Haley v. City of Bos.*, 657 F.3d 39, 46 (1st Cir. 2011) (court evaluating Rule 12(b)(6) motion may consider "facts susceptible to judicial notice"); *AES Puerto Rico, L.P. v. Trujillo-Panisse*, 133 F. Supp. 3d 409, 415 (D.P.R. 2015) ("documents on file in federal or state courts are proper subjects of judicial notice").

Yet, the Superintendence presses that the Catholic schools it oversees are an "integral part" of the Catholic Church. For this proposition, the Superintendence relies on *Surinach v. Pesquera De Busquets*, 604 F.2d 73 (1st Cir. 1979). In that case, the Secretary of the Puerto Rico Department of Consumer Affairs (the "Secretary") "launched an investigation of the costs of private schools operating in Puerto Rico, an investigation which encompassed parochial schools under the aegis of the Roman Catholic Church." *Id.* at 74. The "President of the Inter-Diocesan Secretariat for Catholic Education of Puerto Rico and superintendents of Roman Catholic schools in a number of Puerto Rican dioceses" moved "to have declared unconstitutional" the investigation into "the operating costs of Roman Catholic schools in the Commonwealth." *Id.* at 73.

The First Circuit held that the "schools in question are an integral part of the Catholic Church and as such 'involve substantial religious activity and purpose,'" *Surinach*, 604 F.2d at 76 (quoting *Lemon v. Kurtzman*, 403 U.S. 602, 614 (1971)), and that the "demands for the financial data of these schools both burden[ed] the free exercise of religion and pose[d] a threat of entanglement between the affairs of church and state." *Surinach*, 604 F.2d at 79. And because the Secretary did not present a compelling state interest that justified the interference with the rights secured by the First Amendment, the

---

[7] While the representation made by the Archdiocese of San Juan may not bind the Superintendence in the litigation before this court, I highlight the representation made in the state-court proceeding only for the purpose of illustrating that it is not entirely clear that the Catholic Church itself established the Plan. *See Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.").

First Circuit held "unconstitutional the challenged orders of the Department compelling production of documents and information." *Id.* at 79–80.

To the extent the Superintendence relies on *Surinach* to raise a First Amendment challenge to the statutory construction of the church-plan exemption recommended herein, that argument lacks merit for the reasons expressed above. *See supra* Pt. II.C. And to the extent that the Superintendence argues that it is entitled to the church-plan exemption because the schools it oversees are an "integral part" of the Catholic Church, that argument is also misplaced. To be clear, there is no quarrel with the proposition that the Catholic schools are an "integral part" of the Catholic Church—*Surinach* so holds. *See Surinach*, 604 F.2d at 76. But *Surinach* does not speak to the issue before the court, as that case did not concern the scope of ERISA's church-plan exemption. *See id.* at 79–80.

On the other hand, the *Stapleton* court considered and rejected an argument analogous to the one the Superintendence presses here. *See Stapleton*, 817 F.3d at 530. In that case, Advocate Health Network underscored that "many church-affiliated organizations carry on the work of the church (to care for the sick and needy, for example)." *See id.*; *see also Rollins*, 817 F.3d at 907("church-associated organizations" include, for example, "hospitals and schools"). In light of this relationship, Advocate Health Network argued that such organizations "are . . . *integral* to the mission and purpose of the church." *Stapleton*, 817 F.3d at 530 (emphasis added). Neither the district court nor the Seventh Circuit "quarrel[ed] with this view." *Id.*

Indeed, precisely because of the "shared mission" between a church and the church's affiliated organizations, ERISA permits employees of a church-affiliated organization to "participate in the same retirement plans as church employees with no further distinctions." *Id.* And "churches may have outside organizations maintain their plans." *Id.* But—importantly—none of the foregoing does away with the statutory "requirement . . . that a church must establish the plan in the first place." *See id.* Accordingly, even taking as true that the Superintendence and the schools it oversees are

"integral" to the "mission and purpose" of the Catholic Church, this circumstance does not absolve the Plan from the statutory requirement that it be established by a church rather than a church-affiliated organization in order to qualify for ERISA's church-plan exemption. *See Stapleton*, 817 F.3d at 530.

Relatedly, the Superintendence also highlights that the Catholic Church in Puerto Rico has six Dioceses, that each of the Diocesan Bishops has established an "office" called a "superintendence," and that each superintendence is responsible for administering the Catholic schools within the Bishop's geographic region. Docket No. 48-1 at 7. But these circumstances are not dissimilar to those in *Kaplan*. *See Kaplan*, 810 F.3d at 177. That case involved a pension plan established by St. Peter's Healthcare System ("St. Peter's"), "a non-profit healthcare entity that runs a variety of facilities, including a hospital, and employs over 2,800 people." And while "it is not a church, St. Peter's has ties to the Roman Catholic Diocese of Metuchen, New Jersey." *Id.*

The Third Circuit described various ties between St. Peter's and the Roman Catholic Diocese of Metuchen. *See id.* For example, the *Kaplan* court noted that "the Bishop of Metuchen appoints all but two members of [St. Peter's] Board of Governors." *Id.* And the "Bishop also retains veto authority over the Board's actions." *Id.* Moreover, "the hospital run by St. Peter's features numerous indicia of the church relationship, including daily Mass and the presence of Catholic devotional pictures and statues throughout the building." *Id.* Notwithstanding these ties between the Catholic Church and the church-affiliated organization, the Third Circuit ultimately held that St. Peter's pension plan did not qualify for the church-plan exemption because a church did not establish that plan. *See id.* at 187.

To be sure, the court may resolve the motion to dismiss for failure to state a claim at this juncture because the Superintendence has not argued that the Catholic Church itself established the Plan. But to the extent the Superintendence claims that the Plan was indeed established by a church, that dispute may not and should not be resolved at this juncture

for at least four reasons. First, the allegations in the amended complaint must be taken as true at this stage, and the court may not resolve disputes of fact when evaluating a motion to dismiss for failure to state a claim. *See, e.g.*, *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (court evaluating a Rule 12(b)(6) motion "does not resolve contests surrounding the facts"). Second, to determine whether an entity qualifies as a "church," the court would be required to delve into a fact-bound inquiry calling for consideration of evidence and briefing that has not been presented at this juncture. *See, e.g.*, *Found. of Human Understanding v. United States*, 614 F.3d 1383, 1388 (Fed. Cir. 2010) ("the courts have relied mainly on the IRS's 14 criteria and on the associational test when addressing the distinction between a religious organization and a church").

Third, while the court gave me the discretion to treat the motion before the court as one for "summary judgment," Docket No. 59, I find the record insufficiently developed to rule on the factual issue relating to whether the Superintendence—which established the Plan—qualifies as a "church" rather than an organization, agency, or association affiliated with the Catholic Church. Indeed, given that determining whether an entity qualifies as a "church" calls for a fact-sensitive inquiry, the court would likely benefit from hearing the parties' positions with respect to the facts they find disputed or uncontested—a judicial-efficiency mechanism established by Local Rule 56. *See Am. Guidance Found., Inc. v. United States*, 490 F. Supp. 304, 306–07 (D.D.C. 1980) ("It is not enough that a corporation [which is tax exempt as a religious organization under the Internal Revenue Code] believes and declares itself to be a church.").

Fourth, because the Superintendence has not, with any meaningful specificity, pressed the theory that the Plan was established by the Catholic Church or that the Superintendence itself qualifies as a "church,"[8] granting summary judgment on either of those bases would likely be improper because Martinez and the other alleged beneficiaries

---

[8] I express no view whatsoever on the merits of either of these two presently undeveloped theories.

have not had an opportunity to brief that issue after having received notice that either of these two grounds would lead to the dismissal of their claims. *See Block Island Fishing, Inc. v. Rogers*, — F.3d —, No. 16-1267, 2016 WL 7422699, at *8 (1st Cir. Dec. 23, 2016) ("The district court [erred when it] did not provide Rogers with sufficient notice and opportunity to contend otherwise [on a ground not raised by the opposing party] before entering summary judgment."). Thus, the court should reject the Superintendence's argument that the Plan is covered by the church-plan exemption and thus deny the motion to dismiss.

## III.    Alleged ERISA Violations[9]

The Superintendence moved to dismiss the ERISA claim alleging a breach of the duty of disclosure. Docket No. 27 at 31–34. "ERISA contains specific sections requiring plan administrators to provide participants with information, including a summary plan description." *Watson v. Deaconess Waltham Hosp.*, 298 F.3d 102, 112 (1st Cir. 2002) (citing 29 U.S.C. §§ 1021, 1024). And plan "participants have a cause of action under 29 U.S.C. § 1132(a)(1)(A) against plan administrators who fail to comply with a request to provide any such information." *Watson*, 298 F.3d at 112. "Section § 1132(c)(1)(B) specifies the relief available to such plaintiffs, allowing for penalties of $100 per day and 'such other relief as [the court] deems proper.'" *Id.* "These penalties are limited, however, as the court may only order relief if the plan administrator fails to provide the appropriate documentation within thirty days after a participant *requests* it." *Id.*

In this case, the amended complaint alleged that the defendants "have not made timely compliance with demands for information." Am. Compl. ¶ 71. The amended complaint, which was filed in June 2016, specifies that in April 2016 some of the plaintiffs

---

[9] The Superintendence moved to strike the amended complaint's references to the PBGC, arguing that the PBGC does not cover the Plan. Docket No. 27 at 29–31. But because the alleged ERISA claims against the defendants do not depend on the Plan being insured by the PBGC, this argument need not be addressed at this juncture. *See Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 638 (1990) ("Plans may be terminated 'voluntarily' by an employer or 'involuntarily' by the PBGC," and a "standard termination . . . does not implicate PBGC insurance responsibilities.").

requested but did not receive the Plan's "most recent annual report, its most recent summary annual report, a current summary plan description, and," among other things, "a copy of the trust agreement." *Id.* ¶ 72. Because a failure to comply with a request for a "summary plan description" violates ERISA, the amended complaint adequately alleges a breach of the duty of disclosure. *See Watson*, 298 F.3d at 112. And while the Superintendence raises an evidentiary objection to the document plaintiffs may attempt to use to establish the alleged violation, such an objection is premature because a court may not disregard properly pled factual allegations "even if it strikes a savvy judge that actual proof of those facts is improbable." *Twombly*, 550 U.S. at 556. Thus, the court should not dismiss this claim.

The Superintendence next contends that the court should dismiss the breach-of-fiduciary-duty claim against unidentified fiduciaries, such as the unidentified "wealth management companies," because the amended complaint fails to identify these entities. Docket No. 27 at 34–36. This argument lacks merit, for while the use of a fictitious name to identify a defendant "is disfavored, it serves the legitimate function of giving a plaintiff the opportunity to identify, through discovery, unknown defendants" and amend the complaint under Federal Rule of Civil Procedure 15 once those identities are discovered. *See Green v. Doe*, 260 F. App'x 717, 719 (5th Cir. 2007) (citing *Colle v. Brazos Cnty.*, 981 F.2d 237, 243 n. 20 (5th Cir. 1993)); *see also Figueroa v. Rivera*, 147 F.3d 77, 83 (1st Cir. 1998) (A district court "is not obligated to 'wait indefinitely for [the plaintiff] to take steps to identify and serve . . . unknown defendants.'") (quoting *Glaros v. Perse*, 628 F.2d 679, 685 (1st Cir. 1980)).

Moreover, the well-pleaded allegations in the amended complaint, which describe a scenario where the Plan's administrators paid certain entities for imprudent investment advice, are sufficiently specific to allege a claim under ERISA. Am. Compl. ¶¶ 38–42; *see Dudley Supermarket, Inc. v. Transamerica Life Ins. & Annuity Co.*, 302 F.3d 1, 3–4 (1st Cir. 2002) ("it is clear that the gravamen of the complaint is that Transamerica breached its

fiduciary duty under ERISA to provide competent investment advice and services," and such a claim "would have to be asserted, if at all, under ERISA"). Thus, the court should not dismiss the claims against the fictitious fiduciaries.

## CONCLUSION

For the foregoing reasons, the motion to dismiss should be **DENIED**.

This report and recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within fourteen days** of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**
In San Juan, Puerto Rico, this 9th day of January 2017.

S/ Bruce J. McGiverin
BRUCE J. McGIVERIN
United States Magistrate Judge