## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **IVETTE M. MARTÍNEZ GONZÁLEZ,** et als. | |
| Plaintiffs | **CIVIL NO. 16-2077 (GAG)** |
| v. | |
| **CATHOLIC SCHOOLS OF THE ARCHDIOCESES OF SAN JUAN PENSION PLAN,** et als. | **CIVIL ACTION UNDER THE PROVISIONS OF E.R.I.S.A.; PRELIMINARY AND PERMANENT INJUNCTION; TEMPORARY RESTRAINING ORDER** |
| Defendants | |

### JOINT INITIAL SCHEDULING CONFERENCE MEMORANDUM

**COME NOW**, the parties, through their undersigned attorneys and pursuant to the Order entered by Hon. Magistrate Judge Bruce J. McGiverin, respectfully submit the instant Joint Initial Scheduling Conference Memorandum

## I.    FACTUAL CONTENTIONS

### A.    Plaintiffs

Around 40 years ago, the Superintendence "established" a multiple-employer, "defined-benefit pension plan" (the "Plan") for employees of Catholic schools in Puerto Rico that elected to participate in the Plan. Second Am. Compl. ¶¶ 5, 19. These schools are controlled by an independent board of directors rather than the Roman Catholic Church of Puerto Rico. Id. A trust was established for the Plan, and several fiduciaries were designated to administer the Plan. Id. ¶¶ 5, 7–14. Plaintiffs and all other plaintiffs named in the complaint reside in Puerto Rico and are vested participants or beneficiaries of the Plan. Id. ¶¶ 4, 59.

### A.    The Plan

The Plan was established in 1979, and the Superintendence was identified as the Plan's "settlor or sponsor." Id. ¶¶ 6, 19. Several fiduciaries, along with the Superintendence, were designated at that time to establish a trust that would administer the Plan. Id. ¶ 19. The Deed of Trust, which was approved by the Plan, required the trustees to pay a bond pursuant to a statutory provision of ERISA. Id. ¶¶ 21, 22. Article 2 of the Plan provides that it shall be "interpreted and administered in a consistent manner with the provisions" of ERISA and the income tax law of Puerto Rico, "or any future provision of any applicable law." Id. ¶ 22. Similarly, Article 21 of the Plan provides that the Plan "and all its provisions shall be interpreted pursuant to" Puerto Rico law and ERISA. Id. After the Plan was approved, the Plan's beneficiaries received a notice informing them of various rights protected by ERISA. Id. ¶ 24; and a similar notice was disseminated by the Superintendence in September 1993. Id. ¶ 25.

## B.     ERISA Violations

"The Plan's administrators failed to comply with ERISA because they failed to: (1) send a summary of the annual financial report of the Plan to the participants," and beneficiaries; (2) send the beneficiaries actuarial studies or audited financial statements that related to the Plan; (3) pay annual premiums imposed by the Pension Benefit Guaranty Corporation ("PBGC") since 2009; (4) pay a bond; (5) take measures since 2009 to prevent the Plan's insolvency; (6) diversify the investment fund portfolio by investing 80% of the Plan's funds in "risk[y]" closed-end-bond funds and bonds issued by public agencies in Puerto Rico; (7) act with due "care, skill, and diligence" under the circumstances; (8) maintain an "independent and critical eye" when investing the Plan's funds with the help of outside consultants; and (9) correct their imprudent investments. Id. ¶¶ 26–37. And the brokers who advised the Plan's administrators,

the complaint states, are also allegedly liable for the imprudent investment advice they provided. Id. ¶¶ 38–42.

C.      Termination of the Plan & Church-Plan Exemption

In March 2016, the Superintendence, together with the Plan's administrators and fiduciaries, terminated the Plan and relayed to the Plan's participants and beneficiaries that the Plan was not covered by ERISA because it was a "church plan." Id. ¶ 43.  Taking issue with this characterization of the Plan, Plaintiffs allege that the Plan is covered by ERISA and that the church-plan exemption "is not applicable to the" Plan. Id. ¶¶ 46–47. The amended complaint marshals two alternative bases for alleging that the Plan is not within the ambit of ERISA's church-plan exemption. Id. ¶¶ 47, 49, 50.

First, it is plaintiffs' contention that "most, if not all of the participating employers failed to request exemption from taxation" under the Internal Revenue Code.  Id. ¶ 49 (citing 29" "U.S.C. § 1002(33)(C)(ii)). Second, and "[a]lternatively," Plaintiffs contend that Congress did not intend "to permit church agencies to sponsor their own pension plan—it merely intended to allow employees of church agencies or parochial schools to participate in plans established and maintained by churches or [a] convention or association of churches." Am. Compl.  ¶50.  The amended complaint further alleged that the church-plan exemption" "violates the Establishment Clause of the First Amendment. Id. ¶ 51."

"Given that the Plan has been voluntarily terminated, Plaintiffs purport that the beneficiaries are entitled to have the assets of the Plan distributed in accordance with the provisions of ERISA. Id. ¶ 54.   At the time the second amended complaint was filed, however, the Plan's beneficiaries had not been informed with sufficient specificity how the Plan's assets would be distributed, or the amount of non-forfeitable benefits to which they are entitled. Id. ¶¶

55–58. Plaintiffs and the other beneficiaries claim that they have never waived any of the notices they were entitled to receive. Id. ¶ 56. In June 2016, Plaintiffs and the other beneficiaries filed this action to obtain injunctive relief, payment of benefits, removal of the Plan's administrators, attorneys' fees, and costs—alleging termination of the Plan in violation of ERISA-required procedures, breach of fiduciary duties, breach of the duty of disclosure, and breach of co-fiduciary duties. Id. ¶¶ 56, 61–83."

> **B.**    **Defendants[1]**

## II.    LEGAL CONTENTIONS

> **A.**    **Plaintiffs**

Plaintiffs adopt by reference all the legal contentions purported by them in their Second Amended Complaint; in their Response in Opposition to Motion to Dismiss; Supplementary Opposition to Motion to Dismiss, and Surreply to Reply to Response in Opposition to Motion to Dismiss.

> **B.**    **Defendants**

> **A.**    **The Court does not have jurisdiction in this case because the Pension Plan is a "church plan" exempt from ERISA.**

## I.    HISTORICAL AND FACTUAL BACKGROUND

> **A. ORGANIZATION OF THE ROMAN CATHOLIC CHURCH IN PUERTO RICO**

**Plaintiffs allege that they are employees and/or former employees of catholic schools and entities that belong to the Archdioceses of San Juan, the Diocese of Caguas and the Dioceses of Fajardo - Humacao and that are participants of the**

---

[1] Pursuant to the Court's orders, the Joint Initial Scheduling Conference Memorandum is limited to the controversy of whether the pension plan is a church plan under ERISA.

Pension Plan. Plaintiffs state that the Pension Plan was established by the Superintendence of Catholic Schools of the Archdioceses of San Juan. <u>See</u> Docket No. 9, ¶¶5-6, pp. 12-13. Likewise, Plaintiffs identify the Superintendence as the Pension Plan's sponsor. <u>See</u> Docket No. 9, Parr. 6, p. 13. As the Plan's settlor and sponsor since its establishment, it is clear that, throughout the Plan's existence, the Superintendence of Catholic Schools of the Archdioceses of San Juan has been in charge of maintaining the Plan.

Prior to the cession of Puerto Rico to the United States, the Catholic Church in Puerto Rico was the official religion. In the Treaty of Paris, the parties recognized the Catholic Church's status after the change of sovereignty. <u>See</u> <u>Municipality of Ponce v. Roman Catholic Apostolic Church in Puerto Rico</u>, 210 U.S. 296 (1908); P.R. Laws Ann. tit 1, Treaty of Paris, Article 8.[2]

The Catholic Church in Puerto Rico is divided into five Dioceses in Arecibo, Caguas, Fajardo-Humacao, Mayagüez, Ponce and the Archdioceses of San Juan

---

[2] The Supreme Court in <u>Municipality of Ponce v. Roman Catholic Apostolic Church in Puerto Rico</u>, decided that under the Treaty of Paris the juristic personality of the Catholic Church was recognized. Specifically, the Court held that: "By the general rule of public law, recognized by the United States, whenever political jurisdiction and legislative power over territory are transferred from one nation to another, the laws of the country transferred, intended for the protection of private rights, continue in force until abrogated or changed by the new government. Of course, in case of cession to the United States, laws of the ceded country inconsistent with the Constitution and laws of the United States not locally inapplicable, or the provisions hereof, until altered, amended, or repealed by the legislative authority hereinafter provided for Porto Rico or by act of Congress of the United States,…" The Court also cited the Article 8 of the Treaty of Paris is to this effect: "And it is hereby declared that the relinquishment or cession, as the case may be, to which the preceding paragraph refers, cannot in any respect impair the property of rights which by law belongs to the peaceful possession of property of all kinds, of provinces, municipalities, public or private establishments. Ecclesiastical or civic bodies, or any other associations having legal capacity to acquire and possess property in the aforesaid territories, renounced or ceded, or of private individuals, of whatsoever nationality such individuals may be." The Court interpreted said clause in the following manner: "This clause is manifestly intended to guard the property of the church against interference with, or spoliation by, the new master, either directly or through his local governmental agents.   There can be no question that the ecclesiastical body referred to, so far as Porto Rico was concerned, could only be the Roman Catholic Church in that island, for no other ecclesiastical body there existed."

Puerto Rico. See Official Catholic Directory of 2016.  The administration of said Dioceses for educational matters was discussed and explained by the First Circuit Court of Appeals in Suriñach v. Pesquera de Busquets, 604 F.2d 73 (1st Cir. 1979).

In Suriñach, the Court held that catholic schools were an integral part of the Roman Catholic Church. In Suriñach, the First Circuit recognized the role of the catholic schools in the Roman Catholic Church and the Bishops in the supervision of genuine Catholicism and academic excellence in said schools. Also, the Court cited the Episcopal Conference's Pastoral Letter to emphasize the role of the schools in the Roman Catholic Church.[3]

### B. THE ROLE OF THE SUPERINTENDENCE OF CATHOLIC SCHOOLS IN THE ROMAN CATHOLIC CHURCH

The Pastoral Letter of December 5, 1996, regarding education in the Catholic Schools clearly establishes that the Superintendent of Catholic Schools is an integral part of the church mission. The Pastoral Letter explains the role of the Superintendence of Catholic Schools in each diocese. See December 5, 1996, pastoral letter. Specifically, the Pastoral Letter states that:

> During the second half of the twentieth century it has been outlined the figure of the Superintendent of Catholic Schools. In our aforementioned Pastoral Letter of 1976, we already mentioned, albeit briefly, their specific responsibilities. We are able to define and recognize their role within the educational pastoral today. Each diocesan bishop designates an office to serve all Catholic schools within their respective dioceses. This office, which is known as the Superintendence for Catholic Schools, works

---

[3] See Universidad Central de Bayamón v. NLRB, 793 F.2d 383 (1st Cir. 1986)(emphasizing the role of catholic schools within the Roman Catholic Church).

in close collaboration with the Bishop and their Vicar for Education. **In addition the Vicars and Superintendents integrate, under the chairmanship of a bishop appointed by the Puerto Rican Episcopal Conference, the Episcopal Commission on Education and their Inter – Diocesan Secretariat for Catholic Education. (Our translation)**

<u>See</u> **pastoral letter.**

Pursuant to the pastoral letter, it is clear that the Bishop in each Diocese designates **a**n office of the Diocese, the Superintendence, **to serve the catholic schools. The Bishop works in close collaboration with the Superintendence. The Superintendence is responsible of ensuring the "spiritual growth and intellectual maturity in students."** <u>See</u> Pastoral Letter.

Specifically, the Superintendent "under the ordinary authority of the diocesan pastor" (the Bishop) performs, among others, the following:

1. **Ensures Catholic religious education in all Catholic institutions.**

2. **Promotes, assists and encourages unity among all Catholic schools in the diocese.**

3. **Sets diocesan rules and guidelines on the general organization of Catholic schools.**

4. **Ensures the integration of educational pastoral into the overall diocesan pastoral.**

5. **Disseminates Church documents and ensures that they are known and applied in each school.**

<u>See</u> **pastoral letter.**

## C. THE PENSION PLAN OF THE CATHOLIC SCHOOLS OF THE ARCHDIOCESE OF SAN JUAN

### 1. The sponsor and the participating employers

As stated by Plaintiffs, the Pension Plan was established by the Superintendence of Catholic Schools of San Juan. The Pension Plan was established and is operated and administered pursuant to a plan document ("the Plan Document") that establishes the terms and conditions, that govern the Plan. Article 1, section 27 of the Plan Document states that:

> "Sponsor of the Plan": referred to as 'Settlor' in the deed of trust: the Superintendence of Catholic Schools of the Archdiocese of San Juan.[ *La Superintendencia de las Escuelas Católicas de la Arquidiócesis de San Juan*]
>
> See Plan Document.

The Plan Document defines the term "participating employer" in the following manner:

> "Participating Employer": (i) The Office of the Superintendent of Catholic Schools of the Archdiocese of San Juan and any school that is under the supervision of the Superintendent and chooses to participate in the plan, (ii) any successor to the property of any of them, (iii) any other Catholic school under the supervision of the Superintendence of their respective diocese or superintendence of Catholic schools that assumes in writing the obligations of this plan, and (iv) any agency and/ or branch office of the Catholic Church of Puerto Rico, but in each case subject to the approval of the plan sponsor or their successor.
>
> See Plan Document.

**As of March 8, 2016, the Pension Plan had a total of 43 Participating Employers.[4]**

> 2.  The administration of the Plan and of its assets

**Pursuant to the Plan Document, the Superintendence is the Plan's settlor and sponsor that maintains the Plan and has control over the Plan's operations to the extent it does not delegate totally or partially such control to a Retirement Committee. Specifically, the Plan Document establishes that the sponsor will name a Retirement Committee (*Comité de Retiro*). See Plan Document, Article 12.  As provided in the Plan Document, the Retirement Committee, although remains under the control and direction of the Plan's sponsor, is in charge of the day to day administration of the Plan with respect to everything that concerns Plan participants and their beneficiaries, and serves as a link between the Participating Employers and the participant employees and/or their beneficiaries.  See Plan Document, Article 12.**

II.    DISCUSSION

A.  THE DEFINITION OF CHURCH PLAN IN ERISA

**ERISA exempts from its application those pension plans that are "church plans". Section 33 (A) of ERISA defines the term "church plan" in the following manner: "church plan' means a plan established and maintained (to the extent required in clause (I) of subparagraph (B)) for its employees or beneficiaries) by a church or a convention or association of churches which is exempt from tax under section 501 of title 26."**

---

[4] On March 8, 2016, the participating employers met and determined that the Pension Plan would be terminated.

Also, the statute identifies what is not incorporated in a church plan:

(B) The term "church plan" does not include a plan --

(i) Which is established and maintained primarily for the benefit of employees (or their beneficiaries) of such church or convention or association of churches who are employed in connection with one or more unrelated trades or businesses (within the meaning of section 513 of title 26) or

(ii) if less than substantially all of the individuals included in the plan are individuals described in subparagraph (A) or in clause (ii) of subparagraph (C) (or their beneficiaries).

Finally, section 33 (C) reads as follows:

(C) For purposes of this paragraph --

(i) A plan established and maintained for its employees (or their beneficiaries) by a church or a convention or association of churches includes a plan maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches.

(ii) The term employee of a church or a convention or association of churches includes --

(I) a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry, regardless of the source of his compensation;

(II) an employee of an organization, whether a civil law corporation or otherwise, which is exempt from tax under section 501 of title 26 and which is controlled by or associated with a church or a convention or association of churches; and

....
(iii) A church or a convention or association of churches which is exempt from tax under section 501 of title 26 shall be deemed the employee of any individual included as an employee under clause (ii).

The plan is a church plan under the most liberal construction of the law. In the cases of Kaplan and  Stapleton the court determined that a plan established by a church is a church plan. The present plan was established by the church to cover only employees of the Catholic Schools in the Archdiocese of San Juan and other dioceses. Said schools are an integral part of the Catholic Church and as such "involve substantial religious activity." Suriñach v Pesquera de Busquets, 604 F2d 73 ( 1st Cir 1979)  The Superintendence of Schools of the Archdiocese of San Juan is an office of the Archdiocese , Pastoral Letter. Each Diocese has to establish an office (Superintendence of Schools) to ensure catholic religious education, among other duties and responsibilities.

## B.  PLAINTIFFS' ALLEGATIONS RELATED TO THE PENSION PLAN'S STATUS AS A CHURCH PLAN

As previously stated, Plaintiffs have the burden of establishing that this Court has subject matter jurisdiction over the present complaint by demonstrating that the Pension Plan is subject to ERISA. To do so, they have to prove that the Pension Plan is not a "church plan" within the meaning of ERISA, since, as previously discussed above, "church plans" are specifically exempt from ERISA coverage.   As it will be demonstrated below, Plaintiffs have failed in this attempt.

At the outset, Plaintiffs admit that the Catholic Church's position is that the Pension Plan is a church plan within the meaning of Section 3(33) of ERISA, which requires that the pension plan be established or maintained by a church, and that, for that reason, it is exempt from ERISA coverage under ERISA. See Docket No. 9, ¶46, p. 27. Plaintiffs wisely do not dispute that the Plan is established or maintained by a church.

Rather, Plaintiffs argument against the church plan exemption stems from their allegations that Section 3(33)(A) of ERISA requires that, to be considered a church plan exempted from its application, the pension plan's sponsor must be exempt from taxation under Section 501 of the U.S. Internal Revenue Code (the "Code"), and the pension plan must be maintained for the benefit of the church's employees.  See Docket No. 9. For these purposes, Plaintiffs  indicate that, under ERISA, an "employee of a church" is the employee of a church or a convention or association of churches that is exempt from tax under Section 501 of the Internal Revenue Code and which is controlled by or associated with a church or a convention or association of churches.  29 U.S.C. §33(C)(ii).  They also  allege that a pension plan that would otherwise qualify as a "church plan" would lose the ERISA exemption if less than substantially all of the employees participating in the plan are not duly ordained, commissioned, or licensed ministers of a church, or employees of an organization exempted from tax under Section 501 of the Code. See Docket No. 9, ¶49 of the Amended Complaint.

Pursuant to their previous argument, Plaintiffs specifically allege in the Amended Complaint, that the Pension Plan is not a "church plan" exempted from ERISA coverage because, as they state in ¶5, p. 6 of the Amended Complaint:

> "The plan has several participating employers, who are (i) non-profit corporations or institutions organized under the laws of the Commonwealth of Puerto Rico and that are not tax exempt within the meaning of Section 501(c)(3), of the Internal Revenue Code, 26 U.S.C. sec 501(c)(3), and have not elected to be exempt under Section 501 of the Internal Revenue Code, 26 U.S.C. sec. 501"

> See Docket No. 9, ¶5, p. 6.

Such allegation leads them to conclude and allege in the Amended Complaint that "… most if not all of the plan participants are employed by corporations that are not exempt from tax under section 501…" of the Code, and for that reason the Pension Plan is not a church plan exempted from ERISA coverage. ¶49 of the Amended Complaint. It must be noted that the Roman Catholic Church and the Dioceses do not have the obligation to be incorporated and were recognized by the Supreme Court of the United States as entities in Municipality of Ponce v. Roman Catholic Apostolic Church, supra.

These alleged facts, which apparently were not verified by Plaintiffs, constitute the sole factual reference related to why the Pension Plan is not a church plan. However, once again, the Plaintiffs miss the mark because, as it will shown below, all of the Pension Plan's Participating Employers are tax exempt organizations under Section

501 of the Code and, therefore, there can be no doubt that substantially all of the participating employees are employed by such tax exempted organizations. As such, the Pension Plan fully meets the definition of "church plan" and, therefore, it is exempted from ERISA coverage.

The Pension Plan has 43 participating employers. All of the participating employers are catholic schools and entities of the Archdioceses of San Juan, the Diocese of Caguas, Arecibo and Fajardo - Humacao.

**The Roman Catholic Church is exempt from taxation under the Code at least since 1946. The name of the group tax that has said exemption is** the "United States Conference of Catholic Bishops". The Employer Identification Number is 53-0196617.

**The United States Conference of Catholic Bishops has a group tax exemption**. Under the Internal Revenue Code, a church may include a group tax exemption and all of the entities included in the group are considered tax exempt under Section 501 of the Internal Revenue Code.

On May 27, 2016, the IRS issued a letter **confirming the group tax exemption for the Catholic Church**. In said letter, the IRS confirmed that the Official Catholic Directory of 2016 includes "the names and addresses of the agencies and instrumentalities and the educational, charitable, and religious institutions operated by the Roman Catholic Church in the United States, its territories and possessions that are subordinate organizations under your group tax exemption." Likewise, the IRS stated that "[s]ubordinate organizations under a group exemption do not receive individual

exemption letters. Most subordinate organizations are not separately listed in Publication 78 or the EO Business Master File."

A review of the Official Catholic Directory of 2016 shows that the catholic schools an entities of the Archdioceses of San Juan, the Dioceses of Arecibo, Caguas and Fajardo – Humacao are included. This constitutes all of the participating employers in the plan and squarely refutes the Plaintiffs' contention that the employees worked for institutions that are not exempt under section 501 of the Internal Revenue Code.[5]

In the U.S. District Court for the District of Puerto Rico, the church plan exemption was recognized in <u>Torres v. Bella Vista Hosp., Inc</u>. 639 F. Supp. 2d 188 (D.P.R. 2009). In said case a hospital of the Seventh Day Adventist Church created an employee pension benefit plan. In that case a Retirement Committee "was in charge of the general administration of the Plan and was responsible for carrying out its provisions. The members of the Retirement Committee were appointed by the Hospital's Board of Trustees and could be removed by the Board at any time." It must

---

[5] It must be noted that section 501 of the Code provides a tax exemption for federal tax purposes, it does not provide a tax exemption for purposes of Puerto Rico taxes. Section 3 of the Jones Act of March 2, 1917 (Pub. L. 64-368,39 Stat.9515) and Section 2 of Article VI of the Constitution of Puerto Rico grants the Legislature of Puerto Rico the power to impose and collect taxes in Puerto Rico. As a result, Puerto Rico has its own tax system, which is separate from the United States tax system. Specifically, it is the Puerto Rico Internal Revenue Code of 2011, as amended (the "PR Code"), that determines the tax treatment applicable in Puerto Rico for Puerto Rico source related income, not the US Code. Moreover, the agency in charge of implementing the PR Code is the Puerto Rico Department of the Treasury, not the United States Department of the Treasury or the United States Internal Revenue Service (the "IRS"). Therefore, since the purpose of Section 501 of the US Code is to provide exemption from federal income taxes, and generally, Puerto Rico organizations are subject to Puerto Rico taxes and not federal income taxes, such as in the case of the participating employers in the Plan, reference to Section 501 in ERISA Section 3(33) may not be applicable to certain Puerto Rico non-profit organizations. See IRS letter related to the Hospital de la Concepción.

be noted that in that case the Hospital's by-laws provided that half of the members of the Board of Trustees had to be members of the Seventh Day Adventist Church.[6]

In a last ditch attempt Plaintiffs' allege that the ERISA church exemption is unconstitutional. The exemption has been validated as constitutional for more than three decades. The Church Plan exemption does not violate the First Amendment Establishment Clause. Hence, the church plan exemption is constitutional. See Medina v. Catholic Health Initiatives, 147 F. Supp. 3d 1190, 1203 (D. Colo. 2015) (considering constitutionality of church plan exemption). Alleged violations of the Establishment Clause are usually analyzed using the tripartite test articulated in Lemon v. Kurtzman, 403 U.S. 602 (1971). The Lemon test establishes that "government action does not violate the Establishment Clause so long as it (1) has a secular purpose, (2) does not have the principal or primary effect of advancing or inhibiting religion, and (3) does not foster an excessive entanglement." See also Catholic Bishop of Chicago v NLRB 440 U.S.490 ( 1979) .

An analysis of the three factors established in Lemon demonstrates that the church plan exemption is indeed constitutional. A Congressional purpose to "minimize governmental interference with the decision-making process in religions...does not violate the Establishment Clause." Corporation of Presiding

---

[6] In an apparent sidebar to this case the Plaintiffs allege - as a matter of law because there is no factual averment linked to the allegation - that ERISA's "legislative history" does not allow "a church agency to sponsor their own pension plan" and only intended to "allow the employees of church agencies or parochial schools to participate in plans established and maintained by churches." See Docket No. 9, Parr. 50, p.28. This allegation should not be considered by the Court because the Plaintiffs have not even indicated that the plan is not sponsored by the Catholic Church. It seems that the Amended Complaint was drafted as a summary of a memorandum of law and includes certain references and allegations that are not even linked to any factual averments.

**Bishop of Church of Jesus Christ of Latter-day Saints v. Amos**, 483 U.S. 327, 336 (1987). Precisely, Congress's purpose for establishing the church plan exemption was done to minimize unnecessary entanglement with religion. See **Medina v. Catholic Health Initiatives**, 147 F. Supp. 3d 1190, 1204 (D. Colo. 2015), _citing_ 125 Cong. Rec. 10,052 (1979) (remarks of Sen. Talmadge); 124 Cong. Rec. 12,106 (1978) (remarks of Rep. Conable). There are five exceptions in the act.

A thorough review of the Amended Complaint shows that Plaintiffs are unable to establish that the Pension Plan is not a church plan. More importantly, the arguments raised above unequivocally show that the Pension Plan fully meets all of the requirements to be a "church plan" exempted from the provisions of ERISA. Thus, ERISA is inapplicable in the case at hand and, for that reason, this Honorable Court does not have subject matter jurisdiction to entertain the claims raised in the Amended Complaint.

### C.  THE PENSION PLAN DID NOT MAKE AN ELECTION UNDER § 401 (d) OF THE INTERNAL REVENUE CODE

In the Amended Complaint, Plaintiffs allege that there are certain references in the Pension Plan's plan document (the "Plan Document") and other documents related to the Plan that establish that the Pension Plan incorporated ERISA. The Plan Document merely states that the Pension Plan will be administered **to the extent possible** by the requirements of the **applicable** provisions of ERISA, among other laws. See Article 2(a) of the Plan Document.  This language does not entail that the Pension Plan is subject to ERISA. At most, it would mean that, if there are any ERISA provisions that apply –

which as discussed above there are none – the Pension Plan would be administered consistent with ERISA, to the extent possible. But, even if the Plan incorporated ERISA, that would not be enough to fall under ERISA's coverage and to provide this Honorable Court with subject matter jurisdiction. After all, it is well known that that **a party may not create federal jurisdiction. Said jurisdiction depends solely and exclusively on an Act of Congress or diversity of citizenship.** See  Insurance Corp. of Ireland, LTD. v. Compagnie des Bauxites de Guinee, 456 U.S. 694 (1982) ("[N]o action of the parties can confer subject matter jurisdiction upon a federal court.")

It is by an Act of Congress that a "church plan" is given the opportunity to voluntarily waive its statutory exemption and affirmatively elect to be covered by ERISA. Section 104(b)(2) of ERISA provides that "church plans" are exempted from ERISA coverage unless they elect otherwise under Section 410(d) of the Code. In turn, Section 410(d) of the Code, 26 U.S.C. § 410 (d) provides that if a "church ... which maintains any church plan **makes an election** under this subsection ..., then the provisions of this title relating to participation, vesting, funding, etc.... shall apply to such church plan as if such provisions did not contain an exclusion for church plans[7]." See also Catholic Charities of Maine, Inc. v. City of Portland, *supra*. Thus, it is uncontested that the church plan must make an affirmative election for ERISA to apply.

26 C.F.R. § 11.410-1 establishes the procedure that must be followed for a plan administrator to make an election. The procedure for making an election includes the:

1.   Time of the election.

---

[7] The other ERISA exemptions are in section 410(d) of the statute.

2. By whom election is to be made. The election provided by this section may be made only by the plan administrator of the church plan.

3. The manner of making the election.

4. Whether the election is a conditional election based on a written request for a determination letter.

5. A statement by the Plan Administrator indicating " (i) that the election is made under section 410 (d) of the Code and (ii) the first plan year for which it is effective."

See 26 C.F.R. sec. 11.410-1

The procedure for making an election is clear and specific. The procedure requires a written statement by the Plan Administrator indicating that "the election is made under section 410 (d) of the Code."

In Torres v. Bella Vista Hosp., Inc., *supra*, the Plan issued Plan's rules stating that "at the time of the Plan's creation it was subject to ERISA." Also, the Hospital "filed a Form 5500 along with its federal income tax return, which had an attached notation entitled "Pension Plan" that stated: "The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974." Id. After reviewing the Plan's Rules and the Form 5500, the Court held that these actions do not establish an election under section 410(d). Specifically, the Court held that:

> "[i]n the case at bar, there is no evidence in the record that the Hospital has ever submitted a statement under section 410(d) electing to have the Plan governed by ERISA. The statements found in the Hospital's Form 5500 attachment

> and its 1982 Rules are not affirmative elections under section 410(d) which are required to have ERISA apply to the Plan. Specifically, the statements provided by Plaintiffs are insufficient to satisfy the requirements of 26 C.F.R. sec. 1.410(d)-1(c) as they do not explicitly say that an election is made under section 410(d) of Title 36 and the first plan year for which it is effective."

If the Court in <u>Torres v. Bella Vista Hosp., Inc</u>., *supra*, held that issuing Plan Rules stating that ERISA applied and filing Form 5500 with a notation stating that: "The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974" does not constitute an election under section 410 (d) of the Internal Revenue Code, clearly none of the alleged statements made in the Plan Document and other related Pension Plan documents in this case constitute an election.

Furthermore, the 123 pages of the Amended Complaint do not include a single allegation establishing whether the Pension Plan made an election under § 410 (d) of the Internal Revenue Code and 26 C.F.R. § 11.410-1 and in fact no election was made. Thus, under the Twombly/Iqbal standard the Plaintiffs have not presented any factual averment to establish that the Pension Plan made an affirmative election to be subject to ERISA. Accordingly, Plaintiffs have failed to establish in their Amended Complaint that the Pension Plan is, by the affirmative election required by Section 410(d) of the Code, subject to ERISA and, therefore, have not shown that this Honorable Court has subject matter jurisdiction over the claims raised in the Amended Complaint.

## D.  THE PBGC DOES NOT APPLY TO THE PENSION PLAN

In the Amended Complaint, Plaintiffs include five full pages of references to Title IV of ERISA (p. 30-35). Plaintiffs allege that Defendants did not comply with Title IV of ERISA without providing any details as to the alleged violations.

However, the Plaintiffs do not inform the Court that Title IV simply does not apply to a pension plan established in Puerto Rico. To be subject to Title IV of ERISA, a pension benefit plan must qualify as a "Covered Plan" under ERISA Section 4021, 29 U.S.C. §1321.

**Section 401(a) of the U.S. Code provides, among other qualification requirements, that a pension benefit plan's trust must be created or organized in the United States.** For Section 401(a) purposes, Puerto Rico is not considered part of the United States and, therefore, a pension plan trust created or organized in Puerto Rico is not considered to be a trust created or organized in the United States.

**The Pension Plan** is not, and the allegations in the Complaint do not establish that it is **a "Covered Plan" as defined under Section 4021 of ERISA and, therefore, is not subject to Title IV of ERISA and the PBGC insurance program. Defendants' position is based on the fact that, as previously mentioned, the Plan's trust was created and organized under the laws of Puerto Rico, is located in Puerto Rico and its trustee is in Puerto Rico, and because the Plan has not made an irrevocable election under Section 1022(i)(2).**[8]

---

[8] In a complicated and inexplicable part of the Amended Complaint, the Plaintiffs admit that the PBGC, established pursuant to Title IV, does not apply to Puerto Rico pension plans.

E.  THE PLAINTIFFS DO NOT ESTABLISH THE ALLEGED VIOLATIONS OF FIDUCIARY DUTIES[9]

The two requests made in Count One of the Amended Complaint are the removal of all of the fiduciaries and an order requesting that the plan does not distribute its assets. Both requests are based on Plaintiffs' allegations of breach of fiduciary duties. However, Plaintiffs have not included and served other fiduciaries, including the alleged investment and wealth/management company that supposedly provided advice to the Defendants.

It is more than questionable that Plaintiffs do not know the names of the other fiduciaries, including the alleged investment and the "wealth management company" when they state the following:

> The defendant brokers provided investment advice for a fee to the fiduciaries and administrators of the plan because they advised them on the value of the closed end bonds' funds and other bonds of the Commonwealth of Puerto Rico and made various recommendations about the advisability of investing a substantial amount of money (more than 80% of the pension fund's assets) in these securities and directly purchased them on behalf of the pension plan for a fee. The defendant brokers' advice served as a primary basis for the investment decisions of the plan. Their advice to excessively buy closed end bonds' funds and several bonds of various instrumentalities and public corporations of the Commonwealth of Puerto Rico for a fee, resulted in substantial losses to the pension fund and provoked its insolvency. Defendants brokers represented to the fiduciaries and administrators of the plan that the aforementioned securities were low risk investments, when all the financial indicators tended to show the contrary.
> See Docket No. 9, ¶ 40.

---

[9] This argument only applies if ERISA is applicable to this case.

Plaintiffs allege that these brokers provided advice for a fee; advised the fiduciaries on the value of closed end bonds; made recommendations of investing around 80 % of the pension fund assets; purchased the bonds for a fee; their advice resulted in substantial losses to the fund that provoked its insolvency and represented that the securities were low risk investments.[10]

Ironically, the Plaintiffs do not present specific factual averments. The Plaintiffs do not identify when the brokers were hired, by whom, what was the supposed fee, when was the supposed advice issued, what bonds were actually bought, when were they bought, by whom were they bought, the Plan's assets when the bonds were bought; the Plan's assets after "they suffered substantial losses." Basically, the Plaintiffs concocted a paragraph of ERISA violations included in the statute and the case law and attributed to "fiduciaries" and an unidentified "wealth management company" without providing any details or facts. To add insult to injury, the Plaintiffs request a Temporary Restraining Order and a Preliminary Injunction without presenting a single piece of evidence to establish that any of the fiduciary violations mentioned in ¶ 40 of the Amended Complaint actually happened.

The Plaintiffs request that the Court issue a ruling determining that all of the fiduciaries abridged their fiduciary duties, including an investment and wealth management company, without presenting any real factual averments to buttress said request should be denied.

---

[10] One would think that if the Plaintiffs have knowledge of these transactions, they must know at least the name of the company or the brokers who performed all of the alleged actions.

III.    **STIPULATIONS OF FACTS**

1.      On November 26, 1979, the Superintendence of Catholic Schools of the Archdioceses of San Juan and four fiduciaries known as Father Baudillo Merino, Father John Tomala, Ms. Anabel P. Casey, Brother Francis M. Ouellette and Mr. Santiago Aponte subscribed a deed of trust, before Notary Public, Antonio J. Suárez de la Torre, to establish the Trust of the Catholic Schools of the Archdioceses of San Juan Pension Plan.

2.      The parties stipulate the authenticity and content of the Deed of Trust (Deed Number 12, notarized on November 26, 1979, by Notary Public Antonio J. Suárez de la Torre),

3.      The parties stipulate the authenticity and content of the Pension Plan Document


IV.     **PROPOSED STIPULATIONS OF FACTS**

        **Plaintiffs**

1.      On November 26, 1979, the Superintendence of Catholic Schools of the Archdioceses of San Juan and four fiduciaries known as Father Baudillo Merino, Father John Tomala, Ms. Anabel P. Casey, Brother Francis M. Ouellette and Mr. Santiago Aponte subscribed a deed of trust, before Notary Public, Antonio J. Suárez de la Torre, to establish the Trust of the Catholic Schools of the Archdioceses of San Juan Pension Plan.

2.      According to the original Deed of Trust known as Catholic Schools Employees Pension Plan (Deed Number 12, notarized on November 26, 1979, by Notary Public Antonio J. Suárez de la Torre), the trustees shall discharge their duties with respect to the plan and this Trust solely in the interest of the participants and their beneficiaries pursuant to the terms and conditions of the Plan and this Trust, inasmuch as these terms and conditions are congruent with

the provisions of Title I of the Employee Retirement Income Security Act of 1974 (herein after, "E.R.I.SA.")

3.      After subscribing the deed, the fiduciaries of the Catholic Schools of the Archdioceses of San Juan Pension Plan approved the same.

Article 2 (Terms and Conditions of the Plan) provides that:

A.      Purposes: This plan has been established by the Sponsor of the Plan for the exclusive benefit of the employees of the participating employers and/or their beneficiaries. Inasmuch as it is possible, this document shall be interpreted and administered in a consistent manner with the intention and requirements of the applicable provisions of the "Employees Retirement Income Security Act of 1974," as amended (ERISA) and the Income Tax Law of 1954 of the Commonwealth of Puerto Rico, as amended, or any future provision of any applicable law.

Article 18 (Termination of the Plan) provides the following:

A.      The sponsor reserves the right to terminate this plan completely at any moment, for any reason, or without any reason with the previous approval of the Secretary of the Treasury and the Pension Benefit Guarantee Corporation, and also the majority of the participating employers.

And Article 21 (Miscellaneous Provisions of the Plan), provides the following:

O.      This Plan and all its provisions shall be interpreted pursuant to the laws of the Commonwealth of Puerto Rico and the Employee Retirement Income Security Act of 1974 [E.R.I.S.A.].  The Retirement Committee, in any form, would be held accountable in any Court other than a state or federal court with jurisdiction, if it has the power to act.

4.      After the approval of the plan, the Superintendence of Catholic Schools of the Archdioceses of San Juan published and distributed among the beneficiaries and participants of the plan a document titled "Catholic Schools Employees' Pension Plan of the Archdioceses of San Juan, Summary of the Description of the Plan."

Said document provides, in its paragraph number 26 (Notice to Employees) the following:

5.     As a participant of this plan, you have certain rights and protections under the "Employee Retirement [Income] Security Act of 1974.  E.R.I.S.A. provides that the participants of the plan would have the following rights:

    a.    To examine, without any cost, in the office of the administrator and other places, all the documents of the plan, including the insurance contracts, collective bargaining agreements and copy of all the documents submitted to by the plan to the Department of Labor of the United States, such as annual reports and description of the plan.

    b.    To obtain copy of a detail version of the document of the plan or other information, through a written request address to the the administrator of the plan. The administrator could collect a reasonable amount for photocopying expenses.

    c.    To receive a summary of the annual financial report of the plan.  The law requires that the administrator of the plan provide a copy of this report to each participant.

    d.    To obtain, once per year, one report of the total accumulated pension benefits and the non-forfeitable pension benefits (if there are any) on the closet date on which the benefits would become non-forfeitable.  The plan could require that the report be requested in writing, but it must be furnished at no cost.

    e.    To file a complaint in Federal Court, if any of the requested documents are not received within 30 days counted from the date in which they are requested by the participant, unless the materials are not sent for reasons beyond the control of the administrator.  The Court could require that the administrator of the pay up to $100.00 for each day of delay until these materials are received by the participant.

In addition to establish rights for the participants of the plan, E.R.I.S.A. imposes obligations to the persons responsible for the operation of the pension plan.  These persons are known as "fiduciaries" pursuant to the law.  The fiduciaries are obliged to act exclusively for the benefit of the participants and must act prudently when they make decisions and exert duties under the plan.  The fiduciaries that violate the rules imposed by ERISA could be replaced and could respond for any loss caused in detriment of the plan due to their acts.

Your employer could not discriminate against you to prevent that you enjoy a pension benefit, or to exercise a right under the rules of ERISA.

If any benefit is denied to you in an improper manner you have the right to file a complaint in Federal Court or in a State Court.  If the fiduciaries are misusing the funds of the plan, you have the right to file a complaint in Federal Court or to request the intervention of the Department of Labor of the United States.  If you win the case, the Court could, if it decides to,

request to the defendant to pay the legal costs, including attorney's fees. If you lose the case, the Court could require that you pay the legal costs, including attorney's fees (for example, if the Court decides that your claim is frivolous).

6.      Another document with a similar title, dated September 1, 1993, was published and distributed among the plan participants and beneficiaries by the Superintendence of Catholic Schools of the Archdioceses of San Juan, which contain identical provisions.

7.      Since 2009 until the present all the defendant administrators and fiduciaries of the plan failed to send a summary of the annual financial report of the plan to its participants and beneficiaries as provided by the plan.

8.      Neither the current defendant administrators and fiduciaries of the plan nor the former ever sent to the plan participants and beneficiaries a copy of the actuarial studies performed to the plan or any audited financial statements.

9.      At least since 2009 until the present, the fiduciaries and trustees failed to pay the annual premiums imposed by the Pension Benefit Guarantee Corporation (herein after "the PBGC").

10.      The defendant trustees and fiduciaries failed to pay a bond, in violation of Section 412 of ERISA and the deed of trust of the plan (page 4).

11.      At least since 2009 until 2016, the defendant fiduciaries and administrators of the plan failed to commend actuarial studies for the plan or audited financial statements, to prevent the insolvency of the plan.

12.      The defendant fiduciaries and administrators of the plan failed to inform to the plan participants and beneficiaries about the deficit of the pension fund and its critical financial situation, until the plan became insolvent, during the first months of 2016.

13.     From 2006 until the present, the defendant fiduciaries and administrators of the plan invested more than 80% of the pension plan's fund in close end bonds' funds and other bonds of several instrumentalities and public corporations of the Commonwealth of Puerto Rico. During that period of time such close end bonds' funds and bonds lost between 70-80% of their market value.   Such loss provoked the accelerated insolvency of the plan.   The defendant administrators and fiduciaries of the plan failed to diversify the investment portfolio of the pension fund.

14.     In the instant case the close end bonds' funds and other bonds acquired by the fiduciaries and administrators of the plan were not liquid and carried a great credit risk. Notwithstanding this fact, the fiduciaries and administrators of the plan concentrated more than 80% of the pension funds in the aforementioned investments.

15.     Between 2006 and 2016, defendant brokers provided investment advice for a fee to the fiduciaries and administrators of the pension plan.

16.     The defendant brokers provided investment advice for a fee to the fiduciaries and administrators of the plan as they advised them on the value of the closed end bonds' funds and other bonds of the Commonwealth of Puerto Rico and made various recommendations about the advisability of investing a substantial amount of money (more than 80% of the pension fund's assets) in these securities and directly purchased them on behalf of the pension plan for a fee.

17.     The defendant brokers' advice served as a primary basis for the investment decisions of the plan.

18.     Defendants brokers represented to the fiduciaries and administrators of the plan that the aforementioned securities were low risk investments, when all the financial indicators tended to show the contrary.

19.    The defendant settlor and sponsor of the plan failed to monitor the defendant fiduciaries or to take any action to correct the defendant fiduciaries' and administrators' imprudent investments.

20.    The Superintendence of Catholic Schools of the Archdioceses of San Juan, as settlor and/or sponsor of the Catholic Schools of the Archdioceses of San Juan Pension Plan, its fiduciaries and administrators represented to all its participants and beneficiaries that the plan was covered by the provisions of E.R.I.S.A. until 2016.   However, on or around March 2016, these defendants together with plaintiffs' employers decided to terminate the plan.   Once they made this decision, they publicly claimed that the plan was a "church plan" exempt from such provisions.  See 29 U.S.C. §1002(33).

21.    Co-defendant, the Superintendence of Catholic Schools of the Archdioceses of San Juan does not claim to be a Church and it is not one.  Moreover, in a Motion filed before the Court of First Instance of Puerto Rico in a parallel case filed by other plan participants (Yali Acevedo v. Iglesia Católica Apostólica y Romana, Case No. SJ 2016CV0013), the Roman Catholic and Apostolic Church, represented by the same attorneys in this case, alleged in so many words that:

(i)     the Archdiocese of San Juan is a separate and independent entity of the Catholic Church;

(ii)    the Archdiocese of San Juan is recognized by government agencies and instrumentalities of the Commonwealth of Puerto Rico, including the Judicial Branch, as an entity separate and independent from the Catholic Church;

(iii)   the Superintendence of Catholic Schools belongs to ("pertenece a") the Archdiocese;

(iv)     the Superintendence of Catholic Schools is also an entity separate and independent from the Catholic Church;

(v)     even more important, the Superintendence of Catholic Schools has its own juridical personality and, as such, is a non-for-profit institution dedicated only to educational and religious endeavors; and,

(vi)     as the Archdiocese, the Superintendent is recognized by government agencies and instrumentalities of the Commonwealth of Puerto Rico, including the Judicial Branch, as an entity separate and independent from the Catholic Church.  (**See Docket No. 45-1**).

22.     Plaintiffs' employers and co-defendants, the Superintendence of Catholic Schools of the Archdiocese of San Juan, the fiduciaries and the administrators of the plan represented to them that they were going to enjoy the benefits provided by the plan, when they were hired by their respective schools, if they met the plan requirements.  They were also informed that the plan was created to compensate for the low salaries paid to the catholic schools whose employees participate of the benefits of the plan; as compared to the salaries paid by the Commonwealth of Puerto Rico in the public sector.   Defendant settlor and sponsor, the fiduciaries and administrators of the plan also represented to plaintiffs that they enjoyed the rights and protections recognized by ERISA.   In fact, some of the plaintiffs were already receiving their pensions, after reaching their retirement age.

23.     The Plan provides that, in the event of plan termination, benefits would be distributed in the order set forth in Title IV of ERISA.

Article 18 D. of the plan document provides that when the termination of the Plan has been approved, the fiduciaries of the plan would proceed to liquidate the trust fund and to

dispose of the assets, pursuant to the priorities established by the Regulations of Title IV of ERISA, with the following priorities:

       a.      Benefits to those participants that started to received retirement benefits for at least three years before the termination of the plan, and based on the provisions of effectiveness of the plan during five (5) years prior to the termination of the same.

       b.      The benefits acquired pursuant to the plan.

       c.      Other benefits that could be acquired.

If the assets available to be distributed are insufficient to cover all the claims between any of the established priorities, these funds would be apportioned and distributed equally.  But, it could be permitted to the retirement committee to establish priorities of subclasses between the previously referred classes, on the condition that the categories of subclasses do not discriminate in favor of employees who earn higher salaries, or employees that exert supervisory functions.

**V.**      **WITNESSES**

       **A.**      **Plaintiffs**

       a.      Francis Ouelette
             3018 Oakridge A,
             Deerfield Beach
             FL  33442-1954

Mr. Ouelette would testify about his participation as a signing party of the Deed of Trust of the Catholic Schools of the Archdioceses of San Juan Pension and the intention of the sponsor and participating employers to submit this plan to the coverage and protections of ERISA provisions.  He would also testify about the initial investments made by the fiduciaries and administrators with money deposited in the pension fund of the plan.

       b.      Ms. Anabel P. Casey

Ms. Casey would testify about her participation as a signing party of the Deed of Trust of the Catholic Schools of the Archdioceses of San Juan Pension and the intention of the sponsor and participating employers to submit this plan to the coverage and protections of ERISA provisions.  She would also testify about the initial investments made by the fiduciaries and administrators with money deposited in the pension fund of the plan.

      c.      All the defendants, as hostile witnesses

They would testify about the relationship that exist between the Superintendence of Catholic Schools of the Archdioceses of San Juan, the church and the participating employers. They would also testify about the steps, if any, taken by them and/or the participating employers to obtain tax exemption status pursuant to the provisions of Section 501 of the Internal Revenue Code, 26 U.S.C. § 501(c)(3).

They would also testify about the contents of the all the documents that allegedly prove that the plan subject of this case should be considered a church plan exempt from the provisions of ERISA

They would also testify about the decisions made by them to approve the investments made with the money deposited in the pension fund and the decision to terminate the plan subject of this case.

They would identify investment, brokerage and/or wealth management companies and individual brokers that provided financial and investment advise for fee to the fiduciaries and administrators of the plan.

**B. DEFENDANTS**

      1.      Ms. Ana Cortés – Ms. Cortés is the Superintendent of Catholic Schools of the Archdiocese of San Juan. Ms. Cortés may testify in relation to the nature of the

Superintendence of Catholic Schools, how it is an integral part of the Archdiocese of San Juan of the Roman Catholic Church, its role in the church, its role pursuant to the Pastoral Letter, how it disseminates catholic teachings, the nature and structure of the Superintendence, the duties and responsibilities of the Superintendent, how the Superintendence operates, its relationship with the Archdiocese, its relationship with the Pension Plan, its relationship with the participating employers, how the pension plan is a church plan, how the plan was established and is maintained, the plan's termination,  the allegations in the Complaint,  the affirmative defenses and authenticate any relevant document.

2. Mr. Luis Capacetti - Mr. Capacetti is a scholar of canon law and expert on the internal structure of the Roman Catholic Church. Mr. Capacetti may testify in relation to the Pastoral Letter, the validity and importance of a pastoral letter, the structure of the Roman Catholic Church, the role of a Superintendence of Catholic Schools, the role of a diocese, the organization of a diocese, the responsibilities and duties of a Superintendent, the nature of the Superintendence of Catholic Schools, how it is an integral part of the Archdiocese of San Juan of the Roman Catholic Church, the allegations in the Complaint,  the affirmative defenses and authenticate any relevant document.

## VI.   DOCUMENTARY EVIDENCE

### A.   Plaintiffs

1.    February 9, 2016 - Letter sent by Ms. Ana Cortés Crespo as Superintendent of Catholics Schools of the Archdioceses of San Juan to the Directors of the Pension Plan participating employers to invite them to a meeting set for February 26, 2016.

2.    March 14, 2016 – Letter addressed to the beneficiaries of the Plan sent by Ms. Ana Cortés Crespo as Superintendent of Catholics Schools of the Archdioceses of San Juan.

3.      March 14, 2016 – Letter addressed to the participants of the Plan sent by Ms. Ana Cortés Crespo as Superintendent of Catholics Schools of the Archdioceses of San Juan.

4.      March 14, 2016 – Letter addressed to the participating employers of the Plan sent by Ms. Ana Cortés Crespo as Superintendent of Catholics Schools of the Archdioceses of San Juan and attachment named "Communiqué of the Pension Plan of the Superintendence of Catholic Schools of San Juan."

5.      May 2, 2016 - Letter addressed to the participating employers of the Plan sent by Ms. Ana Cortés Crespo as Superintendent of Catholics Schools of the Archdioceses of San Juan.

6.      Public Instrument number 12 (Deed of Trust), known as "Catholic Schools Employees Pension Trust" notarized by Notary Public Antonio J. Suarez de la Torres dated November 26, 1979.

7.      Plan Document of the Pension Plan of Catholics Schools of the Archdioceses of San Juan effective on September 1st, 1979.

8.      Plan Summary of Catholics Schools of the Archdioceses of San Juan dated September 1st, 1979

9.      Plan Summary of Catholics Schools of the Archdioceses of San Juan dated September 1st, 1993

10.     Letter sent by Atty. Alfredo Fernández Martínez on October 10, 1997 addressed to Father Carlos Quintana of the Archbishopric of San Juan and attachment  (Draft of Public Instrument entitled "Amendment of Reaffirmation of Trust")

11.     Print out of internet site: http://escuelascatolicas-sj.org/Plan_pension.htm (last visit May 14, 2009).

12.     Letter from Atty. Francisco J. Amundaray dated April 25, 2016 addressed to Atty. Frank Zorrilla-Maldonado.

13.     Letter from Atty. Francisco J. Amundaray dated April 28, 2016 addressed to the Superintendence of Catholics Schools of the Archdioceses of San Juan

14.     News clip from: http//sincomillas.com/suspenden-las-pensiones-de-maestros-de escuelas-católicas/ (last visit March 30, 2016) and related comments published therein.

## C. DEFENDANTS

1.      Trust Deed No. 12, issued on November 26, 1979 before the Notary

Public Antonio Suárez de la Torre.

2.      Plan Document of Archdiocese of San Juan Pension Plan.

3.      Pastoral Letter of the Episcopal Conference.

4.      Catholic Directory.

5.      DOL Opinion 85 – 32A, signed by Elliot Daniel, Acting Assistant Administrator for Regulations and Interpretations.

6.      Letters issued by the PBGC regarding coverage of Title IV of ERISA in Puerto Rico.

7.      Letter issued by the U.S. Department of Treasury on May 27, 2016 regarding tax exempt status of the Roman Catholic Church.

8.      Defendants reserves the right to amend this list and use additional documents. Furthermore, Defendant reserves the right to announce any additional documents that might become apparent from the pending discovery, and if so, will promptly notify Plaintiff in order for said party to conduct discovery to that effect.

## VII.   JOINT DISCOVERY PLAN

1.       The parties will serve a First Set of Interrogatories, Request for Production and Request of Admissions, on or before April 15, 2017.

2.      The parties will answer the written discovery by May 15, 2017.

3.      If Plaintiffs understand that they need to amend the Complaint, pursuant to the answers provided in the written discovery, they will do so by May 30, 2017.

4.      The parties scheduled depositions during the week of May 21-25, 2017.

5.      Plaintiffs intend to depose the following persons:

a.      Francis Ouellette

b.      Anabel P. Casey

c.      Monsignor, Roberto O. González (Archbishop of San Juan)

d.      Father, Juan Santa

e.      Samuel Soto

f.      Rosa Figueroa;

g.      Ana Cortés

h.      Marilyn Pannel

6.      Defendants will depose Plaintiffs' witnesses.

7.      Defendants inform the Court that Plaintiffs will receive a transcript of the testimony provided by Ms. Ana Cortés, the Superintendent of Catholic Schools of the Archdiocese of San Juan, in the case of Williams v. APS, Case No. SJ2016CV00131. Defendants state that discovery at this stage of the litigation is limited to the threshold issue of jurisdiction. On the other hand, plaintiffs understand that defendants "confound jurisdictional with merit-based issues". See <u>Report and Recommendation</u>, at p. 6. As clearly stated by the Court, discovery also includes the identification of the Doe defendants. Defendants reserve the right to raise all applicable privileges, including those arising under the Freedom of Religion and separation between church and state.

In San Juan, Puerto Rico, March 23, 2017.

**CARLOS F. LOPEZ LAW OFFICE**
**P.O. Box 8852**
San Juan, P.R. 00910-0852
Tel. 787-273-0611
Fax 787-273-1540
E-Mail**:** charlielopez@gmail.com
        cflopez@atriumoc.com

**AMUNDARAY, VILLARES**
**& ASSOCIATES, PSC**
P.O. Box 9023980
San Juan, PR00902-3980
Tel. (787) 273-0611
Fax (787) 273-1540
E-Mail**:** fjamundaray@aol.com
      fjamundaray@me.com

**s/ CARLOS F. LÓPEZ**                     **s/FRANCISCO J. AMUNDARAY**
Carlos F. López, Esq.                       **USDC-PR-208706**
USDC 126514


**SCHUSTER AGUILÓ LLC**
**Attorneys for Defendants: Superintendence of the Catholic Schools of the Archdioceses of San Juan and Samuel Soto**
PO Box 363128
San Juan, Puerto Rico 00936-3128
Telephone: (787) 765-4646
Telefax: (787) 765-4611

**s/Pedro A. Busó García**               **s/Jaime L. Sanabria Montañez**
Pedro A. Busó García                   Jaime L. Sanabria Montañez
USDC PR No. 222511                    USDC PR No. 225307
pbuso@salawpr.com                     jsanabria@salawpr.com


**FRANK ZORRILLA LAW OFFICE**
**Attorney for Defendant: Trust of the Catholic Schools of the Archdioceses of the San Juan Pension Plan**
PO Box 191783
San Juan, Puerto Rico 00919-1783
Telephone: (787) 250-1510

**s/Frank Zorrilla Maldonado**
Frank Zorrilla Maldonado
USDC PR No. 204107
fzorrilla@fzmlaw.com


**Attorney for Defendant Trust of the Catholic Schools of the Archdioceses of the San Juan Pension Plan**

**RABELL MÉNDEZ, C.S.P.**
P.O. Box 195580
San Juan, P.R. 00919-5580
Phone: (787) 764-1212
S/JESÚS R. RABELL MÉNDEZ
**USDC-PR No. 126701**
jesusrabell@gmail.com